UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RANDALL FREITAS,<br><br>Defendant. | Case No. 20-CR-00223-LHK-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |

On July 9, 2021, Defendant Randall Freitas ("Freitas") filed a motion to suppress. ECF No. 33 ("Mot."). The government filed a timely opposition on July 30, 2021, ECF No. 41 ("Opp."), and Freitas filed a timely reply on August 13, 2021, ECF No. 43 ("Reply"). Having considered the submissions of the parties, the record in this case, and the relevant law, the court DENIES Freitas's motion to suppress.

**I.  BACKGROUND**

  **A. Factual Background**

This matter concerns the procurement and execution of a warrant to search Freitas's residence, as well as the questioning that occurred after the warrant was executed. The following facts are drawn from the search warrant affidavit submitted by Special Agent Lou Strickland of

1

the Department of Homeland Security in support of the application to secure the search warrant, ECF No. 33-1, Ex. A ("Strickland Aff."), as well as the Department of Homeland Security's Investigative Report. ECF No. 33-1, Ex. D ("DHI Report").

On March 14, 2019, Special Agent Strickland received a call from a Customs and Border Protection officer in San Francisco. Strickland Aff. at 2. The officer had intercepted a package from China the contents of which were declared as a "switch." *Id.* The package actually contained four "auto switch" devices. Auto switches convert ordinary handguns into fully automatic pistols, able to fire over 1,000 bullets with a single pull of a trigger. *Id.* at 2, 4. The package was also addressed to a person named "Ace Cuzz." *Id.* When Special Agent Strickland performed a public records check for the address on the package, records indicated that Freitas resided at the address on the package. *Id.* at 3.

Special Agent Strickland conducted a criminal background check on Freitas and found one conviction as an adult for driving under the influence. *Id.* Special Agent Strickland also noted that, as a juvenile, Freitas received a probationary sentence for dissuading a witness, threatening a witness, and taking a vehicle without consent. *Id.* A firearms registration check showed that Freitas owned no registered firearms. *Id.*

Special Agent Strickland also compared Freitas's driver's license photo with photographs he found online of a person named "Ace Cuzz." *Id.* Based on those images, Special Agent Strickland believed Freitas and "Ace Cuzz" were one in the same person. *Id.* Special Agent Strickland noted that he found pictures of Freitas "flashing what appears to be gang signs and wearing the color blue." *Id.* When Special Agent Strickland spoke with a San Jose Police Department intelligence unit about Freitas, the Police Department stated that Freitas was not a registered gang member. *Id.* However, the Police Department did say that the color Freitas was wearing and the gang sign Freitas was flashing in the picture were "indicative of the Asian Boyz . . . criminal street gang." *Id.*

On March 21, 2019, another Special Agent in Homeland Security Inspections drove by the address specified on the package containing the auto switch devices. *Id.* The agent observed a car

2

parked in front of the house registered to Freitas. *Id.* Based on these facts, investigators believed that the package containing the auto switches had been sent to Freitas.

On March 29, 2019, Strickland applied for a search warrant. *Id.* at 10. The application identified the location to be searched as Freitas's residence—the same place to which the intercepted package had been addressed. *Id.* at 1–2. Strickland's affidavit in support of the search warrant described his investigation and proposed performing a "controlled delivery," wherein Homeland Security Inspection agents would "remove the illicit firearm devices and replace them with an [*sic*] objects that appear to be the devices." *Id.* at 7. A U.S. Postal Inspector would then attempt to deliver the parcel to Freitas's house. *Id.* at 8. If Freitas accepted the parcel, law enforcement would then execute the search. *Id.*

Additionally, in his affidavit, Strickland stated that based on his training, experience, and discussions with other federal agents relating to "import-related" and National Firearms Act violations, Special Agent Strickland believed that auto switches like the ones found in the imported package could be classified as "machineguns," making their possession illegal under several federal laws. *Id.* at 7–8. Likewise, based on his training, expertise, and discussions with other federal agents, Strickland stated that some individuals have the ability to manufacture semi-automatic machineguns from scratch, and that illegal firearms traffickers have methods of screening illicit activities from law enforcement detection. *Id.*

The warrant also listed several categories of items to be seized if the warrant was executed. See ECF No. 33-1 Ex. A, Search Warrant Application Attachment B. The list of items to be seized was long. Though it primarily centered on firearms, ammunition, and firearms parts or accessories and evidence suggesting firearms trafficking, it also included personal telephones and telephone books, documents pertaining to package delivery services, any safes, locked cabinets, and/or secured containers, any vehicles, and a variety of electronics and electronic storage devices. *Id.*

United States Magistrate Judge Susan van Keulen reviewed Special Agent Strickland's warrant application and issued the search warrant on March 29, 2019.

On April 2, 2019, at approximately 5:15 p.m., law enforcement executed the search warrant. After the United States Postal Service Agent knocked on the door, Freitas answered, identified himself as "Ace Cuzz," and accepted the package. DHI Report at 2. Law enforcement agents then proceeded to search Freitas's house. At about 5:48 p.m., two agents conducted an interview with Freitas, who stated that he ordered the auto switch devices while he was drunk one night, but that he did not think the devices would actually work. *Id.* The agents also asked Freitas if there was anything illegal in his home. Freitas divulged that there was a small amount of cocaine in his room that belonged to a friend. *Id.* Freitas also noted that there was a gun in a locked box under his bed, and that it was the only gun in his room. *Id.* This interview concluded at about 6:04 p.m. *Id.* at 3.

The agents resumed the interview approximately ten minutes later. An agent told Freitas that law enforcement had found an auto switch in his room. *Id.* At this point, Freitas remembered that he had received another auto switch that he had previously ordered, aside from the four that law enforcement found in the intercepted package. When the agent again asked Freitas if there were any more guns in his room, Freitas divulged that there were several underneath his television. *Id.* Agents found an additional four auto switches in Freitas's room. *Id.* Ultimately, agents seized nine firearms, 22 assorted magazines, 40 boxes of ammunition, and several other items from Freitas's room. ECF No. 33-1, Ex. B.

**B. Procedural History**

On May 8, 2020, the government charged Freitas by complaint with one count of illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o). ECF No. 1. On May 29, 2020, the government charged Freitas by information with the same count. ECF No. 8. The machinegun in question was a Glock-style 9mm pistol modified with an auto switch device. *Id.* at 1.

Freitas a motion to suppress on July 9, 2021. *See* Mot. On July 30, 2021, the government filed their timely opposition to Freitas's motion. *See* Opp. Freitas filed his reply on August 13, 2021. *See* Reply.

4
Case No. 20-CR-00223-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

## II. LEGAL STANDARD

The Fourth Amendment of the U.S. Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause exists when, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Whether there is probable cause is a "commonsense practical question," and "[n]either certainty nor a preponderance of the evidence is required." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (citation omitted).

The initial determination of probable cause by the issuing judge "should be paid great deference" on review. *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The duty of the reviewing court is "to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam); *United States v. Celestine*, 324 F.3d 1095, 1100 (9th Cir. 2003) (defining the reviewing court's role as "determin[ing] whether the magistrate had a substantial basis to conclude that the warrant was supported by probable cause"). For these reasons, "resolution of doubtful or marginal cases in this area should largely be determined by the preference to be accorded to warrants." *Kelly*, 482 F.3d at 1050–51 (quoting *Gates*, 462 U.S. at 237 n.10).

The issuing judge may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and offense. *United States v. Fernandez*, 388 F.3d 1199, 1253 (9th Cir. 2004). The judge need not determine that the evidence is in fact on the premises to be searched but instead that there is a reasonable nexus between the crime or evidence and the location to be searched. *United States v. Crews*, 502 F.3d 1130, 1136–37 (9th Cir. 2007). "For a finding of probable cause to satisfy this nexus requirement, there must be a fair probability both that a crime has been committed and that evidence of its commission will be found in the location to be searched." *United States v. Nguyen*, 673 F.3d 1259, 1263 (9th Cir. 2012).

### III. DISCUSSION

In his Motion to Suppress, Freitas raises two arguments in the alternative. First, he contends that all of the evidence and statements resulting from the execution of the search warrant should be suppressed because the search warrant failed to provide probable cause, rendering the search warrant invalid. *See* Mot. In opposition the government argues that the search warrant was supported by probable cause. Opp. 5–15. Further, the government argues that, even if there were no probable cause to issue a search warrant, Freitas's motion should be denied because Special Agent Strickland acted in good faith in obtaining and executing the search warrant, *id.* at 15–17, because the most relevant evidence was found in plain view, *id.* 17, and because any purportedly invalid portions of the warrant could be severed from the most important valid portions, *id.* at 17–18. Because the Court finds that there was probable cause to issue the warrant and that the warrant was obtained and executed in good faith, the Court does not address the government's other two arguments.

Second, and alternatively, Freitas argues that the Court should order an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), under the theory that Special Agent Strickland recklessly or deliberately omitted necessary facts from the search warrant affidavit. Mot. at 17–25. The government argues that Freitas is not entitled to such a hearing. Opp. 19–21. The Court addresses each of Freitas's argument in turn.

#### A. Probable Cause

To show that the search warrant lacked probable cause, Freitas primarily relies upon two cases about "anticipatory warrants." "An anticipatory warrant is 'a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place.'" *United States v. Grubbs*, 547 U.S. 90, 94 (2006) (quoting 2 W. LaFave, Search and Seizure § 3.7(c), p. 398 (4th ed. 2004)); *United States v. Vesikuru*, 314 F.3d 1116, 1119 (9th Cir. 2002) (similar).

In this case, the government had significant information tying Freitas to the intercepted package in this case. First, Customs and Border Protection intercepted a package from China

containing four auto switches.  Second, those auto switches had simply been declared as "switches" rather than "auto switches."  Third, the auto switches were addressed to "Ace Cuzz,"—Freitas's pseudonym.  Fourth, the address on the package was Freitas's residence, and Freitas's car was seen parked in front of the residence.  Fifth, the auto switches were useless when not attached to a firearm, but when attached to a firearm, those auto switches could enable a gun to fire over 1,000 bullets in one pull of a trigger.

Therefore, the government proposed replacing the auto switches intercepted by Customs and Border Protection—devices capable of transforming a handgun into a fully automatic weapon—with dummy switches.  Strickland Aff. at 2, 4.  The search warrant at issue here was an anticipatory search warrant: it would only be triggered upon Freitas's acceptance of the package containing the dummy auto switches.  Specifically, Freitas argues that had the package contained the real auto switches, law enforcement would have had probable cause to search for those same auto switches, at the very most.  Mot. at 9.  But without the presence of the real auto switches, the only evidence the government had was that a package containing four auto switches was addressed to Freitas's residence, that Freitas went by the same name as the person to whom the package was addressed, and that Freitas himself was not a licensed importer, manufacturer, dealer, or collector of firearms.  Mot. at 11–12.  Freitas also points out that, although the affidavit suggested that Freitas was a possible gang member, the picture that Special Agent Strickland relied upon was old, and the San Jose Police Department stated that Freitas was not a known gang member.  *Id.*

In sum, Freitas contends that—without the real auto switches—there was simply not enough evidence to search his residence for firearms, and that the only way Special Agent Strickland obtained the warrant was by classifying Freitas as an illegal firearms dealer, trafficker, or manufacturer, even though there was no evidence that Freitas was one.

In this way, Freitas draws a line between his situation and two other cases in which the Ninth Circuit found the suppression of evidence was proper.  First, in *United States v. Nora*, 765 F.3d 1049, 1051 (9th Cir. 2014), two uniformed police officers were patrolling the defendant's neighborhood when they witnessed the defendant standing in front of his house, *id.* at 1051.  The

officers temporarily lost sight of the defendant, but when they pulled up in front of the house, they saw the defendant on his porch. *Id.* The police officers stated that the defendant appeared nervous and stiff. *Id.* A few seconds after the officers started a conversation with the defendant, the defendant turned around and headed into his house. *Id.* It was at that point that the officers saw that the defendant was holding a semi-automatic handgun. *Id.* After arresting the defendant for a misdemeanor—carrying a firearm while in any public place or on any public street, Cal. Penal Code § 25850(a), law enforcement obtained a search warrant to search the defendant's home for firearms, drug paraphernalia, evidence relating to the sale of narcotics, and any evidence of gang membership. *Id.* at 1052–1053 1055. The Ninth Circuit in *Nora* ruled that much of the evidence that the police relied upon when obtaining their search warrant was inadmissible. *Id.* at 1058. The only facts on which the warrant could properly be based were the fact that the officers had seen Nora outside of his house with a handgun, and that he had been convicted of two prior firearm offenses. *Id.* at 1058. Based on that evidence, the Ninth Circuit found that law enforcement only had probable cause to search for the handgun the officers observed Nora carrying. *Id.* at 1058–59. The evidence did not authorize the search for drug paraphernalia, gang membership, or even any other firearms. *Id.*

Freitas argues that *Nora* stands for the principle that the presence of one item does not translate to probable cause of the existence of more items. Mot. at 10 n.6. In *Nora*, the defendant's possession of a firearm did not translate into probable cause that the defendant possessed more firearms. *Nora*, 765 F.3d at 1058–59 ("[W]ithout more, the officers' firsthand observations of [the defendant] with a gun in his hand did not give them reasonable grounds to believe that additional firearms would be found in the house.")  Under that reasoning, Freitas would have the Court hold, the presence of four auto switches does not translate into probable cause that Freitas possessed firearms or auto switches in his residence.

However, the Ninth Circuit has held that the probable cause inquiry is based on the totality of the circumstances, not hard and fast rules. *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) ("The nature of the totality-of-the-circumstances analysis also precludes us from

8

holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case."). Here, there was simply more cause to believe that firearms would be contained inside Freitas's house than there was in *Nora*. The government knew that someone—very likely Freitas—had ordered four auto switches. More importantly, the government understood that auto switches have no function but to turn a handgun into a dangerous, fully automatic weapon. Based on the fact that these devices are merely decorative unless they are attached to a handgun, the government was right in believing it was fairly probable that firearms would be present in Freitas's residence. There would be no purpose in purchasing auto switches from China (under a pseudonym, no less) if those auto switches would not be attached to firearms.

The fact that the auto switches are useless without guns is a critical difference from *Nora*. In *Nora*, the officers only saw the defendant with a single handgun. That handgun had a function in and of itself. Therefore, the officers did not have probable cause to search his home for additional handguns—they had already seen the requisite evidence to make their arrest. In Freitas's case, the government rightly concluded that the four functionless auto switches mailed to Freitas's residence were indicative of at least four firearms that could be converted into fully automatic weapons.

Freitas counters that the government was incorrect in assuming that the auto switches could only be used for converting handguns into automatic weapons. Mot. 7–8. Specifically, he states that auto switches can also be attached to airsoft toy guns to make them look more realistic. *Id.* at 7. Within the "airsoft" community, Freitas argues, auto switches are an "exotic" cosmetic enhancement, increasing the purchaser's status as an airsoft toy collector. *Id.* at 7–8.

According to the United States Supreme Court, law enforcement "does not need to rule out a suspect's innocent explanation for suspicious facts" to obtain probable cause for a search warrant. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Here the circumstances were at the very least suspicious: Freitas had the auto switches sent to him from China and ordered them under a fake name—"Ace Cuzz." Moreover, the declarant on whom Freitas relies—former

9

Case No. 20-CR-00223-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

1   Bureau of Alcohol, Tobacco, Firearms and Explosive agent Daniel O'Kelly—concedes that an

2   airsoft toy collector's possession of an auto switch would be considered "exotic." Mot. at 7.

3   Given that law enforcement need not accept an innocent (albeit unlikely) explanation in order to

4   obtain probable cause, Special Agent Freitas could properly infer that the auto switches would be

5   used for real guns, not airsoft toys.

6   Second, and similarly, Freitas relies on the Ninth Circuit's decision in *United States v.*

7   *Weber*, 923 F.2d 1388 (9th Cir. 1990). In that case, the Ninth Circuit held that a warrant to search

8   a suspected pedophile's house for several categories of evidence relating to child pornography

9   lacked probable cause because law enforcement knew only that defendant had responded to a

10  phony advertisement for child pornography that the government itself had sent, and that defendant

11  had apparently been sent child pornography advertising material in the past. *Id.* at 1340. The

12  *Weber* court was clearly disturbed by the government trapping criminal defendants and

13  manufacturing probable cause to search defendants' entire homes. *Id.* at 1344 ("All the

14  government would have to do [to generate probable cause for a search warrant] is send out phony

15  advertisements for child pornography, wait for responses, and immediately execute search

16  warrants to search the houses of those responding affirmatively.").

17  *Weber* is inapposite. Law enforcement in this case did not send Freitas an advertisement;

18  they intercepted a package containing four devices that could turn four, normal semi-automatic

19  weapons into fully automatic weapons. The package was sent from China, addressed to Freitas's

20  residence, and sent to "Ace Cuzz," a pseudonym that Freitas was known to use. When Customs

21  and Border Protection intercepted the package, it was labeled as a "switch," not as "four auto

22  switches." Law enforcement also confirmed that Freitas was staying at the house to which the

23  package was addressed by identifying Freitas's vehicle parked in front of the address. Law

24  enforcement also knew that Freitas was not licensed to import, manufacture, deal, or collect

25  weapons. In *Weber*, law enforcement created probable cause all on its own. Here, law

26  enforcement encountered facts and circumstances that established probable cause. That simple

27  distinction renders *Weber* inapplicable.

28

1   Therefore, under the totality of the circumstances, the government reasonably inferred that
2   Freitas would have weapons at his house.  And more importantly, Strickland's affidavit gave
3   United States Magistrate Judge Susan van Keulen substantial basis for finding probable cause.

4   Finally, even if there was no probable cause to support the warrant based on Special Agent
5   Strickland's affidavits, suppression is still not an appropriate remedy in this case.  That is because
6   the United States Supreme Court has decided that "the marginal or nonexistent benefits produced
7   by suppressing evidence obtained by objectively reasonable reliance on a subsequently invalidated
8   search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S.
9   897, 922 (1984).  The Supreme Court has stated that an officer's reliance on a magistrate's
10  probable cause determination and subsequent issuance of a warrant is typically sufficient to
11  establish "that a law enforcement officer has 'acted in good faith in conducting the search.'" *Id.*
12  (quoting *United States v. Ross*, 457 U.S. 800, 815–819 (1982)).  Suppression in these
13  circumstances is only appropriate when (1) the magistrate is misled by an affidavit that the affiant
14  knew was false or would have known was false if the affiant did not "recklessly disregard" the
15  truth, (2) the magistrate wholly abandoned her judicial role, or (3) the warrant is "so facially
16  deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

17  None of these three circumstances exist in this case.  Freitas argues that Special Agent
18  Strickland included a picture of Freitas wearing blue and flashing gang signs, but Special Agent
19  Strickland omitted the fact that the picture was quite dated.  Freitas also argues that Special Agent
20  Strickland should have included in his affidavit that auto switches could be attached to toy airsoft
21  guns. Mot. at 19–22.  Though Special Agent Strickland omitted the date of the picture he
22  described in his affidavit and did not mention that auto switches can be used to adorn airsoft guns,
23  there has been no sufficient showing that Strickland knowingly or recklessly omitted these facts.

24  However, Freitas argues that Special Agent Strickland was trying to paint him as a current
25  gang member, but Special Agent Strickland included facts in his affidavit that tended to show the
26  opposite.  Special Agent Strickland informed Judge van Keulen that the San Jose Police
27  Department had not registered Freitas as an active gang member.  Indeed, the paragraph describing

28

11
Case No. 20-CR-00223-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

the photo of Freitas wearing blue and flashing gang signs is a description of an image search for "Ace Cuzz." Strickland Aff. at 3 ¶ 9. Therefore, the omission of the date on which the picture was taken does not appear to have been designed to mislead Judge van Keulen.

Moreover, as to the fact that auto switches may be attached to airsoft toys, Special Agent Strickland was under no obligation to rule out every possible innocent explanation before concluding that the auto switches would likely be attached to real firearms. *Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). And even Freitas's own declarant described auto switches as "exotic" within the airsoft community. Mot. at 7. Special Agent Strickland therefore did not recklessly omit facts by not including a detailed discussion of the "airsoft community" in his search warrant affidavit.

Aside from the fact that there is no evidence showing that the Special Agent Strickland knowingly or recklessly omitted critical information from his search warrant affidavit, there is also no evidence to show that Judge van Keulen wholly abandoned her judicial role, and the warrant was certainly not "so facially deficient" that law enforcement agents could not reasonably rely upon it.

All told, there has not been a sufficient showing to support the suppression of evidence. The Supreme Court has stated that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause." *Leon*, 468 U.S. at 914. But here, where a neutral and detached magistrate issued the warrant, the search warrant affiant did not knowingly or recklessly omit facts in his affidavit, and there was substantial evidence tending to support probable cause, suppression of evidence would not further the purposes of the exclusionary rule. Therefore, the Defendant's motion to suppress is DENIED.

### B. Evidentiary Hearing

In the alternative, Freitas requests that the Court grant an evidentiary hearing to "challenge the truthfulness of statements made in affidavits supporting the warrant," *United States v. Johns*, 851 F.2d 1131, 1133 (9th Cir. 1988). Such evidentiary hearings are known as *Franks* Hearings, after the Supreme Court case *Franks v. Delaware*, 438 U.S. 154 (1978). "[A] party moving for a

*Franks* hearing must submit 'allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'" *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002). The movant must also show that any omitted information is material. *Id.* The movant—here, Freitas—"bears the burden of proof and must make a substantial showing to support both elements": deliberate falseness and reckless disregard of the truth, and also materiality. *Id.*

Here, Freitas fails at the first step. Freitas argues that Special Agent Strickland omitted two facts: first, the fact that auto switches can be attached to airsoft guns, and second, the fact that the picture of him flashing "gang signs" was old. As discussed above, it is true that both of these facts were omitted from his affidavit, but Freitas fails to make a "substantial showing" that Special Agent Strickland omitted these facts deliberately, or with reckless disregard for the truth. Therefore, the Court DENIES Freitas's motion for a *Franks* evidentiary hearing.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Freitas's motion to suppress. The Court also DENIES Freitas's alternative request for a *Franks* evidentiary hearing.

**IT IS SO ORDERED.**

Dated: September 16, 2021

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge